## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| MICHELLE YVONNE M., | Case No.: 4:19-cv-00411-BLW-REB |
| Petitioner, | **REPORT AND RECOMMENDATION RE: PETITIONER'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | **(Dkt. 21)** |
| Respondent, | |

Before the Court is Petitioner's Complaint/Petitioner for Review (Dkt. 1), seeking review of the Social Security Administration's denial of her application for Social Security Disability (and Supplemental Security Income disability) benefits for lack of disability. This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Report and Recommendation:

## I. ADMINISTRATIVE PROCEEDINGS

On February 14, 2017, Petitioner protectively filed a Title II application for a period of disability and disability insurance benefits, and also protectively filed a Title XVI application for supplemental security income, alleging disability beginning March 2, 2012 (later amended to February 14, 2017). These applications were initially denied on May 3, 2017 and, again, on reconsideration on September 7, 2017. On September 19, 2017, Petitioner filed a Request for Hearing before an Administrative Law Judge ("ALJ"). On September 13, 2018, ALJ Christopher Inama held a video hearing in Twin Falls, Idaho, at which time Petitioner, represented by attorney Todd Pingel, appeared and testified. Kourtney Layton, an impartial vocational expert, also appeared and testified at the same hearing.

**REPORT AND RECOMMENDATION - 1**

On January 14, 2019, the ALJ issued a Decision denying Petitioner's claims, finding that she was not disabled within the meaning of the Social Security Act.  Petitioner timely requested review from the Appeals Council and, on August 23, 2019, the Appeals Council denied Petitioner's Request for Review, making the ALJ's Decision the final decision of the Commissioner of Social Security.

Having exhausted her administrative remedies, Petitioner filed an action in this Court on October 24, 2019, alleging generally that she is disabled and "[t]he conclusions and findings of fact of the respondent are not supported by substantial evidence and are contrary to law and regulation."  Compl./Pet. for Review, p. 2 (Dkt. 1).  In particular, Petitioner claims that the ALJ failed to properly evaluate her mental illness and fibromyalgia.  *See* Pet.'s Mem. ISO MSJ, pp. 9-19 (Dkt. 21).  Petitioner therefore requests that the Court either reverse the ALJ's Decision and find that she is entitled to disability benefits or, alternatively, remand the case for further proceedings.  *See id.* at p. 19; *see also* Compl./Pet. for Review, p. 2 (Dkt. 1).

## II.  STANDARD OF REVIEW

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards.  *See* 42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990).  Findings as to any question of fact, if supported by substantial evidence, are conclusive.  *See* 42 U.S.C. § 405(g).  In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence.  *See Hall v. Sec'y of Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993).  The standard is fluid and

**REPORT AND RECOMMENDATION - 2**

nuanced, requiring more than a scintilla but less than a preponderance (*see Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

As to questions of fact, the role of the Court is to review the entire record  to determine whether it contains evidence that would allow a reasonable mind to accept the conclusions of the ALJ.  *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019.  The ALJ is responsible for determining credibility and resolving conflicts in medical testimony  (*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)), resolving ambiguities (*see Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)), and drawing inferences logically flowing from the evidence (*see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).  Where the evidence is susceptible to more than one rational interpretation, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ.  *See Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

As to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed or remanded for legal error.  *See Matney*, 981 F.2d at 1019.  The ALJ's construction of the Social Security Act is entitled to deference if it has a reasonable basis in law. *See id*.  However, to be clear, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute."  *See Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

### III.  REPORT

A.     **Sequential Process**

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§

404.1520, 416.920) – or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA").  *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  SGA is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  *See* 20 C.F.R. §§ 404.1572(a), 416.972(a).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized.  *See* 20 C.F.R. §§ 404.1572(b), 416.972(b).  If the claimant has engaged in SGA, disability benefits are denied, regardless of how severe her physical/mental impairments are and regardless of her age, education, and work experience.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not engaged in SGA, the analysis proceeds to the second step.  Here, the ALJ found that Petitioner "has not engaged in substantial gainful activity since February 14, 2017, the amended alleged onset date . . . ."  (AR 18).

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  *See* 20 C.F.R. §§ 404.1521, 416.921.  If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).  Here, the ALJ found that Petitioner has the following

medically determinable impairments:  "lumbar and cervical degenerative disc disease . . . ." (AR 18).

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's impairments neither meet nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.  *See id*.  Here, the ALJ concluded that Petitioner's above-listed impairments, while severe, do not meet or medically equal, either singly or in combination, the criteria established for any of the qualifying impairments.  *See* (AR 22).

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  *See* 20 C.F.R. §§ 404.1545, 416.945.  Likewise, an individual's past relevant work is work performed within the last 15 years or 15 years prior to the date that disability must be established; also, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  On this point, the ALJ concluded:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except she is limited to occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; and occasionally balancing, stooping, kneeling, crouching, and crawling.  She is limited to occasionally overhead reaching with the left upper extremity.  She is limited to frequent lateral reaching with the left upper extremity, with no other manipulative limitations.  She

**REPORT AND RECOMMENDATION - 5**

must avoid concentrated exposure to extreme cold.  She must avoid moderate exposure to vibrations and to workplace hazards, such as unprotected heights and dangerous machinery.

(AR 22).

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of her impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993).  Here, the ALJ found that Petitioner "is capable of performing past relevant work as a customer service representative" as "[t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity . . . ."  (AR 24). Therefore, the ALJ concluded that Petitioner "has not been under a disability, as defined in the Social Security Act, from February 14, 2017, through the date of this decision . . . ."  (AR 24).

## B.     Analysis

Petitioner argues that the ALJ erred in ruling that certain of her medically determinable impairments were non-severe.  *See generally* Pet.'s Mem. ISO MSJ, pp. 9-19 (Dkt. 21). Petitioner claims that her mental illnesses (depression and anxiety) and fibromyalgia preclude her from performing basic work activities and, thus, should be considered medically severe impairments at step two of the sequential process.  *See id.*; *see also* Pet.'s Reply ISO MSJ, pp. 1-3 (Dkt. 24).

At step two of the sequential evaluation, the ALJ must determine if the claimant has a medically severe impairment or combination of impairments.  *See Smolen v. Chater*, 80 F.3d 1273, 1289-90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987)).  The Commissioner's regulations provide that "[a]n impairment or combination of impairments is not

severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a), 416.921(a).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," and those abilities and aptitudes include:  (1) physical functions such as walking, standing, sitting, lifting, and carrying; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *See* 20 C.F.R. §§ 404.1521(b), 416.921(b).

The Supreme Court has recognized that the Commissioner's "severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account."  *Yuckert*, 482 U.S. at 153.  But, as importantly, the regulation must not be used to prematurely disqualify a claimant.  *See id*. at 158 (O'Connor, J., concurring).  "The step-two inquiry is a de minimis screening device to dispose of groundless claims.  An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work."  *Smolen*, 80 F.3d at 1290 (internal quotation marks and citation omitted).

Here, for the reasons that follow, the ALJ's consideration of Petitioner's mental illnesses and fibromyalgia at step two of the sequential process was appropriate.

1.   The ALJ Properly Evaluated Petitioner's Mental Illnesses at Step Two of the Sequential Process

Though finding Petitioner's depression and anxiety to be medically determinable mental impairments, the ALJ did not include them at step two of the sequential process (along with

**REPORT AND RECOMMENDATION - 7**

Petitioner's lumbar and cervical degenerative disc disease (*see supra*)) because they did not cause more than a minimal limitation in her ability to perform basic work activities and were therefore non-severe.  *See* (AR 20).  Applying the "paragraph B" criteria, the ALJ concluded that Petitioner's mental impairments caused only mild limitations in her ability to (1) understand, remember, or apply information; (2) interact with others; (3) maintain concentration, persistence, and pace; and (4) adapt or manage herself.  *See id*.[1]  As a result, the ALJ also concluded that Petitioner's mental impairments were non-severe.  Petitioner disagrees, saying that the ALJ improperly gave greater weight to a non-examining physician, Dr. Michael Dennis, over examining physicians Drs. Stephen DeNagy and Sterling Andelin without sufficient reasons for doing so.  *See* Pet.'s Mem. ISO MSJ, pp. 9-17 (Dkt. 21).

ALJs are to resolve ambiguities and conflicts in the medical record.  *See Magallanes*, 881 F.2d at 750.  An ALJ must provide clear and convincing reasons for rejecting the uncontradicted medical opinion of a treating or examining physician, or specific and legitimate reasons for rejecting contradicted opinions, so long as they are supported by substantial evidence.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  However, the ALJ need not "accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."  *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012).  Additionally, a physician's opinion may be properly discounted if it is based on internal inconsistencies, contains inconsistencies with other evidence in the record, or for other factors the ALJ deems material to resolving ambiguities.  *See Morgan v. Comm'r of Soc. Sec.*

---

[1]  In evaluating Petitioner's limitations in these broad functional areas, the ALJ engaged in the "special technique" outlined in the regulations.  *See John Thomas C. v. Saul*, 2020 WL 4730729, at *6 (E.D. Wash. 2020) (citing 20 C.F.R. §§ 404.1520a, 416.920a); *see also* (AR 21) (ALJ stating: "The limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential process.").

**REPORT AND RECOMMENDATION - 8**

*Admin.*, 169 F.3d 595, 601-02 (9th Cir. 1999).  Finally, an ALJ is not bound to a physician's opinion of a claimant's condition on the ultimate issue of disability.  *Magallanes*, 881 F.2d at 751.  If the record as a whole does not support the physician's opinion, the ALJ may reject the opinion.  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).  Items that may not support the physician's opinion include clinical findings from examinations, conflicting medical opinions, conflicting physician's treatment notes, and the claimant's daily activities.  *See id.*; *see also Bayliss*, 427 F.3d 1211; *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003); *Morgan*, 169 F.3d at 601-03.  Employing those standards, the ALJ properly considered the opinions of Drs. DeNagy and Andelin relative to Petitioner's mental illnesses.

Relevant here, Dr. DeNagy completed a questionnaire on July 3, 2017 which noted that, as to the above-referenced "paragraph B" criteria, Petitioner had experienced marked limitations in understanding, remembering, or applying information; moderate limitations in interacting with others (social functioning); extreme limitations in concentrating, persisting, or maintaining pace; and marked limitations in adapting or managing herself.  *See* (AR 1516-19).  Relatedly, Dr. DeNagy concluded that, as a result of these impairments, Petitioner would be unable to complete a workday (assuming Petitioner was employed in a full-time job) more than three or four times per month and that Petitioner experienced "substantial loss" in her ability to (1) understand, remember, and carry out simple instructions; (2) make judgments that are commensurate with the functions of unskilled work, *i.e.*, simple work-related decisions; (3) respond appropriately to supervision, co-workers, and usual work situations; and (4)  deal with changes in a routine work setting.  *See* (AR 1521-22).

However, the ALJ gave "little weight" to these opinions because they were "inconsistent with the objective medical record and were not supported by the claimant's activities of daily

living . . . ."  (AR 21).  Petitioner contends that conclusion cannot withstand scrutiny.  *See* Pet.'s Mem. ISO MSJ, pp. 12-17 (Dkt. 21).  The undersigned disagrees.

First, the Court notes that Dr. DeNagy indicated within the July 3, 2017 questionnaire that Petitioner's limitations existed "*at the assessed severity*" since 2004.  (AR 1522) (emphasis in original).[2]  Assuming as much, it is undisputed that Petitioner was able to work during this intervening time period while suffering from the same impairments she now claims are disabling and prevent her from working.  *See, e.g.*, (AR 247) (documenting summary of earnings for years 2000-2012); (AR 266, 274) (Petitioner's Work History Reports).  In short, the argument does not neatly follow.  *See, e.g.*, *Arthur v. Comm'r of Soc. Sec. Admin.*, 2020 WL 2497696, at *7 (D. Idaho 2020) ("Petitioner's understood personality impairments have been an unchanging constant over time, straddling his amended alleged onset date.  Yet, Petitioner has worked during this time and has done so despite those same limitations . . . .  This reality necessarily calls into question Dr. Parkman's claim that Petitioner is altogether incapable of sustained work activity and, in and of itself, represents a specific and legitimate reason for discounting her contrary opinions.").

Second, Dr. DeNagy's July 3, 2017 questionnaire does not seamlessly parallel his treatment notes for Petitioner.  For example, his questionnaire response states that Petitioner's ability to understand, remember, or apply information is markedly limited, but his treatment note for that same day indicates that Petitioner's memory is "age-appropriate."  *Compare* (AR 1518), *with* (AR 1590).  Perhaps that disconnect was a function of the questionnaire being filled out only after Dr. DeNagy's second visit with Petitioner (AR 1590).  However, this finding remained

---

[2]  Much of Dr. DeNagy's handwriting is illegible, such that it is possible that the onset date of Petitioner's limitations (as opined by Dr. DeNagy) is actually 2009.  Any difference in this respect is without any material distinction for the purposes of this Report and Recommendation, recognizing Petitioner's February 14, 2017 amended alleged onset date.

**REPORT AND RECOMMENDATION - 10**

relatively constant throughout his treatment of Petitioner, as well as that of Counselor David Chiddix (also within the same Pearl Health Clinic), over the course of the next year.  *See* (AR 1570, 1575, 1579, 1582, 1585, 1593, 1596, 1650, 1653, 1656, 1661-62, 1665, 1668, 1673, 1676, 1679, 1684, 1688, 1691, 1696, 1700, 1705).  Similarly, it is worth mentioning too that, for each of Dr. DeNagy's visits with Petitioner, he reported a lack of "cognitive impairment" when reviewing Petitioner's psychiatric systems.  *See* (AR 1575, 1589, 1661, 1673, 1684, 1696, 1704).

Elsewhere in Dr. DeNagy's treatment notes, he referenced Petitioner's depression and anxiety symptomology; but that is undisputed, as the ALJ also found these to be Petitioner's medically determinable mental impairments.  *See* (AR 20).  Similarly, the extreme limitations contained within the questionnaire are not paralleled elsewhere in Petitioner's treatment history with Dr. DeNagy.  Therefore, at most, they are internally inconsistent; and, at the very least, they are not consistent or supporting.  *See Morgan*, 169 F.3d at 601-03 (ALJ may reject medical opinion that is internally inconsistent).

Third, the opinions set out in Dr. DeNagy's July 3, 2017 questionnaire are not clearly shared by the other examining physician, Dr. Andelin.  For example, Dr. Andelin conducted a "mental status exam" on Petitioner, on August 25, 2017, commenting:

- "**Appearance**  Clothing, posture and grooming were appropriate.  Her physical movements were slow and she appeared to feel uncomfortable.  She had tattoos and at least one body piercing near her nose."

- "**Behavior**  Eye contact was good, no indication of hyperactivity.  Was able to pay attention and was compliant with requests.  She moved slowly and appeared to be in pain."

- "**Attitude**  No indications of denial or intentionally withholding information.  She was cooperative throughout."

- "**Level of Consciousness**  Patient was reasonably alert and engaged during the assessment."

**REPORT AND RECOMMENDATION - 11**

- "**Orientation**  Was fully oriented with respect to person, place, and time.  She clearly understood the reason for her appointment with me."

- "**Speech and Language**  Speech was of normal speed, low volume and appropriate.  She was not very talkative but responded adequately."

- "**Mood**  When asked how she was feeling she said her body aches and she was very nervous about being here (meaning away from her home).  She described her feelings as being depressed, anxious, and irritable."

- "**Affect**  Flat, sad, and dysphoric."

- "**Thought Process/Form**  Thought processes are linear and goal-oriented."

- "**Thought Content**  Her recent thoughts were of her current situation., i.e., her deteriorating health and financial stress.  She indicates she has night terrors and insomnia related to PTSD."

- "**Suicidality and Homicidality**  No suicidal thoughts and is not a suicide risk.  No indications of homicidal thinking or behaviors."

- "**Insight and Judgment**  Her insight is good.  She understands her situation and potential outcomes.  Her judgment is adequate.  She knew what to do with a stamped and addressed envelope and what she should do if she smelled smoke in a movie theater."

- "**Attention Span**  She was able to repeat 4 numbers forward and backwards and she spelled "World" correctly, forward and backwards.  She could do serial 7's from 100, but made an error with serial 3's from 20.  Was able to answer 3 of 3 arithmetic problems correctly."

- "**Memory**  Recent memory.  She knew the time of her appointment and my name.  Remote memory.  She knew her social security number and the date of her marriage.  Immediate memory.  She was able to recall two of three words after 5 minutes."

- "**Intellectual**  She gave the names of 5 of the last 5 presidents of the United States and knew the name of the current president, the governor of Idaho, but not the vice president or the mayor of Idaho Falls.  She named these cities as 5 of the 5 largest in the USA:  New York, Los Angeles, Seattle, Miami, and Dallas.  Her vocabulary is consistent with a high school graduate.  Her understanding of similarities was good and she knew the meanings of 2 of 4 proverbs."

**REPORT AND RECOMMENDATION - 12**

(AR 1603-04) (emphasis in original).  Far from agreeing with Dr. DeNagy's assessment of

Petitioner (at least via the July 3, 2017 questionnaire), Dr. Andelin concluded:

> On the basis of my interaction with [Petitioner] and the results of the Mental Status Exam, her mental status is within normal limits.  There are no indications of substance abuse.  My opinion is that she is able to effectively manage her own finances, but that she is limited occupationally due to physical conditions.  She is also limited emotionally due to depression and anxiety.  Her ability to perform work related mental activities such as understanding, remembering, and concentration are diminished.  She also lacks the physical capacity due to her deteriorating medical conditions.  Her self-reports are consistent with the medical records I reviewed and there is no reason to believe her responses are not valid and truthful.

(AR 1604).  In other words, Dr. DeNagy found Petitioner to experience substantial loss in

several basic, work-related mental activities on a sustained basis (*see supra*), but Dr. Andelin did

not agree – to the contrary, Dr. Andelin's findings supported a conclusion that Petitioner's

mental status is largely normal.[3]

    Fourth, the medical record itself – beyond Dr. Andelin (*see supra*) – does not align with

the conclusions reached in Dr. DeNagy's July 3, 2017 questionnaire.  For example, as the ALJ

referenced, Dr. Dennis' May 2, 2017 disability determination reflected only mild or no

limitations *vis à vis* the "paragraph B" criteria.  (AR 21) ("As for the opinion evidence, great

weight will be given to the opinion of the State agency mental determination at the initial level

regarding the claimant's mild limitations in the four areas of mental function because it is

consistent with the objective medical evidence . . . and supported by the claimant's activities of

---

[3]  Dr. Andelin's references to physical limitations are not at issue here.  Moreover, his comments about Petitioner being "limited emotionally" and having certain "diminished" capabilities are not only unquantifiable and therefore vague, they also are inconsistent with his overall conclusion that Petitioner's mental status is "within normal limits."  (AR 1604); *see also* (AR 21) (ALJ giving little weight to Dr. Andelin's opinion "because it is inconsistent with [his] own findings on exam.  For example [he] found the claimant to be alert and oriented, with normal memory, insight, and judgment, and linear thought process.").

**REPORT AND RECOMMENDATION - 13**

daily living . . . .") (citing (AR 71, 84)).[4]  And, concerning such "objective medical evidence,"

the ALJ pointed out (for each of the "paragraph B" criteria) the following:

- <u>Understanding, Remembering, or Applying Information</u>:  "The record shows that she was able to provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, respond to questions from medical providers, and there is no mention of any issues with the claimant's short- or long-term memory."  (AR 20) (citing (AR 274-78, 281-89, 1130, 1570, 1575, 1590, 1604, 1662, 1673, 1684, 1696, 1705, 1720)).

- <u>Interacting With Others</u>:  "Finally, the medical evidence shows that the claimant was described as cooperative."  (AR 20) (citing (AR 1602)).

- <u>Concentrating, Persisting, or Maintaining Pace</u>:  "She contended that she has limitations in concentrating generally.  This is corroborated by only one mental status examination that opined she would be easily distractible."  (AR 20) (citing (AR 1573)); *but see* (AR 20) (citing (AR 1329 ("Attention:  not easily distracted"), 1475 (same), 1479 (same), 1500 (same))).

- <u>Adapting or Managing Oneself</u>:  "Meanwhile, the objective evidence in the record showed her to have appropriate grooming and hygiene and normal mood and affect."  (AR 20) (citing (AR 1579, 1582, 1585, 1593, 1603, 1650, 1668, 1676, 1679, 1691, 1700, 1720)).

Petitioner does not directly challenge these findings, except to say matter-of-factly that

"Dr. Rosium, M.D., Dr. Zoe, and Dr. Andelin's diagnoses are consistent with Dr. DeNagy who

found [her] disabled [and,] [a]s such, Dr. DeNagy's diagnosis is consistent with the medical

---

[4]  Petitioner appropriately counters that Dr. Dennis's opinions predated certain of the medical records that Dr. Dave Sanford later considered and, after doing so, found more "moderate" limitations in the "paragraph B" criteria.  *See* Pet.'s Mem. ISO MSJ, p. 13 (Dkt. 21) (citing (AR 102, 127)).  The ALJ acknowledged as much, but nonetheless assigned Dr. Sanford's opinions "less weight" because "it is inconsistent with the objective medical evidence and not supported by the claimant's activities of daily living . . . .").  There is no question that a set of medical records exists that Dr. Dennis did not consider (and could not have considered) for the purposes of his disability determination.  However, the ALJ did; and the Court's own consideration of those records similarly reveals largely subjective complaints and generic comments (at times internally inconsistent or at odds with the balance of the medical record) that speak broadly to Petitioner's affect, mood, and judgment.  *See supra, infra.*  This is not enough to either substantiate Dr. DeNagy's opinions specifically or contradict the ALJ's findings generally.  These records confirm the ALJ's conclusion that Petitioner's depression and anxiety are medically-determinable impairments.

**REPORT AND RECOMMENDATION - 14**

record."  Pet.'s Mem. ISO MSJ, p. 12 (Dkt. 21).  But Petitioner does not actually reference these other providers' records (other than Dr. Andelin's (*see supra*)), discuss them at all, or connect them to a corresponding finding that Petitioner has something other than mild limitations in the "paragraph B" criteria.  Said another way, such evidence, without more, arguably confirms what the ALJ found – namely, that Petitioner has limitations in these areas, but that such limitations rise only to mild levels.  Whether the record *also* can be read to support a finding that Petitioner has more substantial limitations is immaterial and avoids the standard of review applicable to the ALJ's findings in this setting.  *See supra*.  Simply put, Petitioner's overarching arguments to the contrary do not *ipso facto* upend the ALJ's reasoned findings.

Lastly, the ALJ highlighted Petitioner's daily activities that (1) speak to the "paragraph B" criteria and, in doing so, (2) collide with Dr. DeNagy's more constricting limitations for Petitioner.  *See generally* (AR 20).  For example, the ALJ found that:

- Petitioner's ability to "perform simple maintenance, prepare meals, pay bills, go to doctors' appointments, take medications, shop, drive, . . . read[,] . . . provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, [and] respond to questions from medical providers," do not support more than mild limitations in understanding, remembering, or applying information.  (AR 20) (citing (AR 274-78, 281-89, 309-17, 1130, 1570, 1575, 1590, 1604, 1662, 1673, 1684, 1696, 1705, 1720)).

- Petitioner did not allege any problem relating to interacting with others and, according to her statements, "she is also able to get along with others, shop, spend time with friends and family, deal appropriately with authority, and live with others."  (AR 20) (citing (AR 281-89, 309-17)).  Still, the ALJ assigned mild limitations to this domain.  *See* (AR 20).

- Petitioner's claim that she has limitations in concentrating generally, contrasted against her ability "to drive, prepare meals, watch TV, reach, manage funds, use the internet, and handle her own medical care," reflect only mild limitations in her ability to concentrate, persist, or maintain pace.  (AR 20) (citing AR 281-89, 309-17)).

- Petitioner did not allege any symptoms or limitations relating to adapting or managing herself, stating that "she is able to handle self-care and personal

**REPORT AND RECOMMENDATION - 15**

hygiene, care for pets, and care for her child." *Id*. Still, the ALJ assigned mild limitations to this criterion. *See* (AR 20).

Such daily activities speak not only to the severity of Petitioner's symptoms, but equally to the opinions contained within Dr. DeNagy's July 3, 2017 questionnaire. *See* (AR 21) (ALJ stating: "Moreover, the claimant engaged in activities of daily living that are inconsistent for an individual with a severe mental impairment."); *see also, e.g.*, *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990) (where claimant "indicated that she was able to take care of her personal needs, prepare easy meals, do light housework, and shop for some groceries," court found that "[a]n ability to perform such activities may be seen as inconsistent with the presence of a condition which would preclude all work activity.").

In sum, to establish a severe impairment, Petitioner needed to demonstrate that her understood medically determinable impairments affect her ability to perform basic work activities during the relevant period. *See supra*. Based on the record before the Court, Petitioner has not met this standard as to her depression and anxiety. At best, there are threads of medical evidence that could be interpreted as suggesting the existence of a severe medical impairment. But this is somewhat beside the point. The ALJ's opinion is enough to withstand challenge if it is supported by substantial evidence. And here it is. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) ("The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation); *see also infra*, (citing *Flatten*, 44 F.3d at 1457 (same) and *Key*, 754 F.2d at 1549 (same)). Had there been more supporting medical evidence, the landscape from which to judge the ALJ's disability determination would be

different.  However, on this record, the ALJ did not err in concluding that Petitioner does not

have a severe impairment or combination of impairments.[5]

1.    The ALJ Properly Evaluated Petitioner's Fibromyalgia at Step Two of the
Sequential Process

Petitioner argues that "the ALJ did not address fibromyalgia."  Pet.'s Mem. ISO MSJ, p.

19 (Dkt. 21).  But the record is to the contrary, with the ALJ explaining:

---

[5]  As Petitioner explains, an ALJ is required to consider all limitations, whether severe or
non-severe, when assessing a claimant's RFC.  *See* Pet.'s Mem. ISO MSJ, pp. 13-15 (Dkt. 21);
*see also* 20 C.F.R. § 416.945(a)(2) ("We will consider all of your medically determinable
impairments of which we are aware, including your medically determinable impairments that are
not 'severe' . . . when we assess your residual functional capacity."); *see also Hutton v. Astrue*,
491 Fed. Appx. 850, 850-51 (9th Cir. 2012) (although ALJ found claimant's impairment of PTSD
to be non-severe because it caused only "mild mental limitations in the area of concentration,
persistence or pace, and no episodes of decompensation," ALJ was required to consider mild
limitations in RFC analysis); *but see Ball v. Colvin*, 2015 WL 2345652, at *2-3 (C.D. Cal. 2015)
(ALJ did not err in not including mild mental limitations in RFC where ALJ's finding that
mental limitations do not cause more than minimal limitations in Plaintiff's ability to perform
basic mental activities was supported by record, and distinguishing *Hutton* as based on ALJ's
"explicit refusal" to consider claimant's mild mental limitations caused by PTSD in RFC).
However, an ALJ need not include such non-severe limitations in the RFC if they do not cause
more than a minimal limitation on a claimant's ability to work.  *See Medlock v. Colvin*, 2016 WL
6137399, at *5 (C.D. Cal. 2016) ("Consideration of 'the limiting effects of all impairments' does
not necessarily require the inclusion of every impairment into the final RFC if the record
indicates the non-severe impairment does not cause a significant limitation in the plaintiff's
ability to work."); *Ball*, 2015 WL 2345652, at *3 (mild mental impairments "by definition do not
have more than a minimal limitation on Plaintiff's ability to do basic work activities . . . which
translates in most cases into no functional limitations," and thus ALJ was not required to include
them in RFC).  Here, the ALJ did  consider Petitioner's mild mental limitations in assessing the
RFC.  *See* (AR 18) ("In making this finding [about the RFC], I must consider all of the
claimant's impairments, including impairments that are not severe."); *see also* (AR 21)
("Therefore, the following residual functional capacity assessment reflects the degree of
limitation I have found in the 'paragraph B' mental function analysis."); (AR 22) ("In making
this finding [about the RFC], I have considered all symptoms and the extent to which these
symptoms can reasonably be accepted as consistent with the objective medical  evidence and
other evidence . . . .").  This is enough.  *See, e.g., Scotellaro v. Colvin*, 2015 WL 4275970, at *9
(D. Nev. 2015) ("Although the ALJ did not extensively discuss Plaintiff's mental impairment at
step four, he thoroughly discussed the evidence supporting his findings at step two and
incorporated them by reference in his RFC analysis.").  Again, the ALJ found that the record did
not show that Petitioner's depression and anxiety caused a significant limitation in her ability to
work.

**REPORT AND RECOMMENDATION - 17**

The claimant and the claimant's representative alleged that she is limited in her ability to perform basic work activities due to her fibromyalgia symptoms. However, there are no records from a medically acceptable clinical or laboratory diagnostic technique to confirm the claimant's fibromyalgia. Additionally, there is no evidence to show the claimant had at least 11 positive tender points upon physical examination that were found bilaterally (left and right side of the body), nor that the claimant had these tender points above and below the waist in accordance with SSR 12-2p. Additionally, most mental and physical examinations did not find the claimant to have issues with cognition, memory, or irritable bowel syndrome, per SSR 12-2p. I find no medically determinable impairment of fibromyalgia because this allegation is not consistent with SSR 12-2p.

(AR 19).

Apparently arguing instead that the above-referenced analysis is insufficient under SSR 12-2p, Petitioner counters by stating that:

She was identified with fibromyalgia by Dr. DeNagy. He states: "The patient has full-symptom whole body fibromyalgia. I am suspicious of the causes; I think it has a lot to do with her past trauma. We also started her on Lyrica 100 mgb.i.d., less than her previous prescribed dose and discontinue her gabapentin. I think it is too complicated to try to add in this new medication."

Pet.'s Mem. ISO MSJ, p. 19 (Dkt. 21) (quoting (AR 1576)).[6] But the ALJ has already acknowledged as much. *See supra* (identifying Petitioner's claimed fibromyalgia at step two of the sequential process). And the ALJ went on to discuss *why* it did not rise to the level of a medically determinable impairment. *See id*.

There are two specific sets of criteria that can establish that a person has a medically determinable impairment of fibromyalgia. One is based on the 1990 American College of Rheumatology (ACR) Criteria for the Classification of Fibromyalgia; the other derives from the 2010 ACR Preliminary diagnostic Criteria. Under the 1990 ACR criteria, a person much have:

---

[6] Elsewhere in her briefing (though not incorporated within her arguments critical of the ALJ's fibromyalgia analysis), Petitioner mentions Dr. Andelin's reference to her alleged fibromyalgia. *See* Pet.'s Mem. ISO MSJ, p. 3 (Dkt. 21) (citing (AR 1602)). However, to be clear, Dr. Andelin is simply relaying Petitioner's own self-report of fibromyalgia in that moment in time. *See* (AR 1602) ("She has multiple medical problems relating to musculoskeletal issues. She stated she has arthritis, fibromyalgia, and headaches.").

**REPORT AND RECOMMENDATION - 18**

(1) a history of widespread pain; (2) at least 11 positive tender points on physical examination; and (3) evidence that other disorders that could cause the signs or symptoms have been excluded. Alternatively, based on the 2010 ACR criteria, a claimant can be found to have fibromyalgia if he or she has:  (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or conditions, especially fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could have caused these repeated manifestations of symptoms have been excluded.  *See* SSR 12-2p; *see also* Pet.'s Mem. ISO MSJ, pp. 18-19 (Dkt. 21) (citing *Revels v. Berryhill*, 874 F.3d 648, 656-57 (9th Cir. 2017)).

Though not referenced specifically, the ALJ addressed both the 1990 ACR criteria and the 2010 ACR criteria, concluding that the medical record does not establish either criteria's requirements.  *See* (AR 19).  In response, Petitioner states only that Dr. DeNagy diagnosed Petitioner with fibromyalgia, but nothing more.  *See supra* (citing (AR 1576)).[7]  An unadorned diagnosis neither equates to a severe impairment, nor amounts to a disability from which benefits attach.  *See Febach v. Colvin*, 580 Fed. Appx. 530, 531 (9th Cir. 2014); *see also* 20 C.F.R. § 404.1521, 416.921 ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).").  The ALJ considered the longitudinal medical record and provided sufficient reasons for differentiating between those impairments that significantly limit her ability to perform basic work activities, and those that do not.  While

---

[7]  This May 30, 2017 treatment note indicates that Petitioner's fibromyalgia "has been treated for many years with Savella 50 mgb.i.d.," suggesting that the condition preceded Petitioner's onset date by several years.  (AR 1572); *see also* (AR 1573) ("She has difficulty standing from a seated position because of her bad knees, and she has had bad knees and osteoarthritis since she was a teenager.").  Separately, despite Dr. DeNagy's diagnosis itself, his examination that day fails to support a finding of fibromyalgia under either the 1990 or 2010 ACR criteria.  *See* (AR 1575-76).

**REPORT AND RECOMMENDATION - 19**

there may be space to argue that the ALJ was incorrect in doing so, his analysis is supported by substantial evidence and based on proper legal standards.[8]

The record establishes that Petitioner suffers from several impairments (and the ALJ describes certain impairments as "severe" (*see* AR 18-22)) that impact her ability to work. However, the ALJ provided specific legitimate reasons for rejecting or questioning certain opinions contained in the medical record. It follows, of course, that the ALJ gave less weight to those opinions than Petitioner argues that they deserved. But, the ALJ did consider such opinions in the context of the surrounding medical record. In this record, conflicting medical opinions, testimony, and accounts informed the ALJ's consideration of and decisions upon the various opinions. The ALJ discounted certain opinions while crediting others. He did so based upon clear and convincing, specific, and legitimate reasons. Hence, because the evidence can reasonably support the ALJ's conclusions in these respects, this Court will not substitute its judgment for that of the ALJ's even if this Court were to have a different view. *See Richardson*, 402 U.S. at 401; *Matney*, 981 F.2d at 1019.

## IV.  CONCLUSION

The ALJ, as fact-finder, must weigh the evidence, draw inferences from facts, and determine credibility. *Allen*, 749 F.2d at 579; *Vincent ex. rel. Vincent*, 739 F.2d at 1394; *Sample*, 694 F.2d at 642. If the evidence is susceptible to more than one rational interpretation, one of which is the ALJ's, the Court may not substitute its interpretation for that of the ALJ. *Key*, 754 F.2d at 1549. The ALJ has provided reasonable and rational support for his well-formed

---

[8] The medical evidence that exists (and just as importantly does not exist) during the relevant time frame, alongside Petitioner's daily activities (*see supra*), also represent both specific and clear and convincing reasons for rejecting Petitioner's testimony on the issue of her mental impairments and fibromyalgia. *See* (AR 23); *see also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 791 (9th Cir. 1997); *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001); *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1298 (9th Cir. 1999).

**REPORT AND RECOMMENDATION - 20**

conclusions, even if such evidence is susceptible to a different interpretation.  Accordingly, the ALJ's decisions as to Petitioner's disability claim were based on proper legal standards and supported by substantial evidence.  Therefore, the Commissioner's decision that Petitioner is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record and is based upon an application of proper legal standards.

The Commissioner's decision should be affirmed and Petitioner's Motion for Summary Judgment should be denied.

## V.  RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that the decision of the Commissioner be AFFIRMED, that Petitioner's Motion for Summary Judgment (Dkt. 21) be DENIED, and this action be DISMISSED in its entirety, with prejudice.

Pursuant to District of Idaho Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days . . ., unless the magistrate or district judge sets a different time period."  Additionally, the other party "may serve and file a response, not exceed ten pages, to another party's objections within fourteen (14) days after being served with a copy thereof."

DATED: March 2, 2021

_____
Ronald E. Bush
Chief U.S. Magistrate Judge

**REPORT AND RECOMMENDATION - 21**